**In re Jean P. LARSEN, Debtor.**

**Bankruptcy No. 84–00487–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Dec. 18, 1987.

H. Jason Gold, Alexandria, Va., for debtor.

Wayne F. Cyron, Fairfax, Va., for Bennett.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter arises upon the motion of the debtor, Jean P. Larsen, asserting that certain claims of a creditor, Phyllis Hetrick Bennett, must be stricken because they were not timely filed. In response, Phyllis Hetrick Bennett ("Bennett") moved this Court to consider her claim an administrative expense incurred in preservation of the bankruptcy estate and entitled to priority payment. See 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).[1] After argument on the issues, the Court took the matter under advisement.

On or about March 1, 1983, Larsen relinquished to one Hugh McGee management and control of her automobile service station, which operated under a Mobil Oil Company franchise. McGee, with others, contemplated forming a corporate entity, to be known as Our Own Enterprise, Inc. ("OOE"), to own and operate the business; to this end, Larsen and McGee had previously executed a pre-incorporation agreement on February 21, 1983, which provided that OOE would assume all corporate debts and liabilities in return for full management, control and an assignment of ownership of the service station. OOE was subsequently incorporated on March 11, 1983. After OOE assumed responsibility for the ongoing operation of the service station, McGee, as agent of OOE, signed two promissory notes evidencing an aggregate debt of Fifteen Thousand Dollars ($15,000.00) to Bennett. The first note, executed on March 13, 1983, was for Ten Thousand Dollars ($10,000.00); the remaining amount of Five Thousand Dollars ($5,000.00) was borrowed under a second note, dated April 7, 1983. These funds were used to pur-chase gasoline needed for the ongoing operation of the service station.

On December 8, 1983 Larsen and McGee entered into a written contract memorializing the agreement under which OOE took control of the service station. By its terms, the December document superceded all pre-incorporation agreements. Under this contract, OOE assumed all debts and liabilities of the service station "for which Larsen is or may be liable in any capacity," and covenanted to pay Larsen Fifteen Thousand Dollars ($15,000.00) in equal monthly installments over four years. In return, Larsen granted OOE a license to operate and manage the business, and Larsen conveyed her right, title and interest in the service station to a trust for the benefit of OOE, with Larsen as trustee. The document reserved for Larsen a right to rescind the contract and terminate the license should OOE default upon any of its covenants or obligations. The right of recision, contained in Article IV(5)(c) and (d) of the contract, contemplated a re-assumption by Larsen of all obligations and liabilities of the business then existing, and specifically provided for assumption of those liabilities listed on Exhibit B of the document. Although Bennett did not introduce the document into evidence, McGee testified that Exhibit B listed both notes owed to Bennett.

On April 20, 1984, Larsen filed her petition for relief under Chapter 11 of the Bankruptcy Code. Shortly thereafter, on May 4, 1984, Larsen filed with the Court a list of executory contracts, in which she noted her acceptance of the December 8th contract with OOE. By letter dated June 15, 1984, Larsen exercised her right of recision under the accepted contract, and subsequently took possession and control of the service station. The turnover of the business was accomplished by written agreement between Larsen and McGee. The document provides, in part:

The following is hereby agreed and covenanted by the signatories below:

---

1. All section references, unless otherwise noted, refer to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

... The Agreement dated 8 December 1983 between the aforementioned parties is wholly and completely dissolved and Jean Larsen is hereby conveyed all stock ownership in Our Own Enterprises, Inc., and all obligations in conformance with the agreement.

On August 16, 1984, with Court approval, the service station was sold.

On December 3, 1984, well after the bar date for filing proofs of claim in this case, Bennett filed with the Clerk a proof of claim in which she asserted Larsen's liability on the promissory notes executed by McGee for OOE to Bennett in the aggregate amount of Fifteen Thousand Dollars ($15,000.00) by virtue of "Larsen's acceptance of contract with McGee." Seven months later, on July 3, 1985, Bennett filed a second proof of claim in which she stated that her claim was administrative in nature and should be accorded the proper priority. On July 19, 1985, the debtor-in-possession moved to stike each of these proofs of claim because they were untimely filed.

The deadline for filing proofs of claim in this case was August 20, 1984 ("bar date"). Because Bennett was not scheduled as a creditor, she was required to file a proof of claim if she wished to participate in the estate's distribution. *See* Bankruptcy Rule 3003(c)(2). Although she filed her claims well beyond the bar date, it is her contention that the Court should exercise its discretion under Bankruptcy Rule 3003(c)(3), which provides that:

> The Court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.

Bankruptcy Rule 3003(c)(3).

Although Bennett did not move for leave to file her proofs of claim, her defense to the motion to strike is essentially the same: she claims she has shown cause for an extension. The Court will treat her defense in the same posture as if she had moved for leave to file her proofs. Accordingly, Rule 3003(c)(3) must be read in conjunction with Rule 9006(b). *See, e.g., In re South Atlantic Financial Corp. (Biscayne 21 Condominium Ass'n Inc. v. South Atlantic Financial Corp.),* 767 F.2d 814, 817 (11 Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *In re Southern Commodity Corp.,* 62 B.R. 4, 5 (Bankr.S.D.Fla.1986); *In re O.P.M. Leasing Services, Inc.* 35 B.R. 854, 867 (Bankr.S.D.N.Y.1983).

Bankruptcy Rule 9006(b) provides in pertinent part:

> When an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of the court, the court for cause shown may at any time in its discretion..(2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect

*In re South Atlantic Financial Corp.,* 767 F.2d at 817, held that proof of excusable neglect in this context requires proof that:

> the failure to timely perform a duty was due to circumstances which were beyond the reasonable control of the person whose duty it was to perform.

Since Bennett was an unscheduled "creditor",[2] she did not receive notice of the claims bar date. Furthermore, no evidence has been presented to show she had actual knowledge of this date. The relevant inquiry is whether Bennett, having actual knowledge that Larsen had filed a petition in bankruptcy, was obligated to inquire about a possible limit on the time for filing a claim. Since she attended many status hearings in the case, the circumstances were within her reasonable control to discover this information. Thus, if she had an obligation to inquire, her failure to do so would not be excusable neglect and, therefore, her claims should be disallowed as untimely filed under Rule 3003.

■ One court has previously stated that creditors have a right to assume reasonable notice will be given them before their claims are forever barred. *In re Middle Plantation of Williamsburg, Inc.,* 36 B.R. 873, 875 (Bankr.E.D.Va.1984) (citing *City of New York v. New York N.H. & H.R. Co.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333

**2.** At all relevant times, Larsen has denied any obligation to Bennett.

(1953)). In the *Williamsburg* case, however, the debtor was aware of the creditor's claim and had listed it as disputed. Thus, the ruling in *Williamsburg* can be distinguished on its facts. In the instant case, the Court has no evidence of this creditor's demand and intention to hold Larsen liable until the first proof of claim was filed. Bennett does not claim she was unaware of the bankruptcy filing before the claims bar date. But her mere presence at status hearings does not provide sufficient notice to the debtor that she holds a claim. Without notice of her claim, Larsen could hardly have been expected to provide notice to Bennett. Under similar circumstances, another court has ruled that an unknown creditor, aware of his debtor's bankruptcy petition, must make further inquiry to determine whether his claim might be affected. *In re Siouxland Beef Processing Co.*, 55 B.R. 95, 100 (Bankr.N.D. Iowa 1985). This Court finds such reasoning persuasive and concludes that Bennett was obliged to make further inquiry into the status of her claim.

Bennett nevertheless maintains that she did make further inquiry and, under the circumstances, failed to file her claim for good cause. She contends she did make further inquiry by attending status hearings and by relying on the opinion of debtor's counsel that she had no claim against Larsen. It is not Bennett's contention that debtor's counsel intentionally misled her but that she relied on his opinion to her detriment and thereby reasonably failed to file her proof of claim. Even if the Court were to agree that her failure to file a timely proof of claim was excusable, this excuse does not extend to the second proof of claim. Having decided in December 1984 that she did hold a claim, which she then filed, she had no reasonable excuse for waiting an additional seven months to file her second proof of claim. Thus, regardless of the merits of her argument, the second filing cannot be attributed to excusable neglect and, therefore, is untimely and disallowed. However, it does not appear that her failure to file even the first proof of claim was excusable. Although Bennett maintains she withheld filing her claim because she relied on the opinion of debtor's counsel that she had no claim, debtor's counsel clearly represented her adversary in this matter and thus she took his advice at her peril. She had ample opportunity to seek the opinion of other counsel, but she failed to do so. This Court considers the inquiry she made insufficient to discharge her obligation. Therefore, this Court finds that Bennett's failure to file a timely claim is not excused and, consequently, both proofs of claim are disallowed.

Assuming *arguendo* that both of Bennett's proofs of claim were timely filed, we turn to a consideration of Bennett's contention that her claim for $15,000.00 should be accorded administrative priority. Under section 503(b)(1)(A) of the Code, "the actual, necessary costs and expenses of preserving the estate" shall be allowed as administrative expenses. 11 U.S.C. § 503(b)(1)(A). Section 507 of the Code denominates administrative expenses allowed under section 503 as expenses of first priority. 11 U.S.C. § 507(a)(1).

Bennett asserts a novel argument in support of her contention that Larsen's debt to her, acquired by virtue of Larsen's recission of the December contract, should be accorded administrative status. The criterion for allowance of an administrative expense was set forth by the United States Court of Appeals for the First Circuit in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). Under the *Mammoth Mart* test, a claim will be accorded administrative priority only if both (1) the debt arises "from a transaction with the debtor-in-possession" and (2) "the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession." 536 F.2d at 954. Bennett asserts that, although her extension of credit was to OOE rather than to the debtor and antedates the filing of Larsen's petition in bankruptcy by more than one full year, her claim nonetheless satisfies the *Mammoth Mart* test.

█ Bennett contends her claim satisfies the first prong of the test because Larsen was not liable for repayment of OOE's debt to her until Larsen rescinded the December

agreement. She urges that Larsen's post-petition rescission of the contract, which establishes Larsen's liability on OOE's debt to Bennett, is a "transaction with the debtor-in-possession" as the phrase was used by the *Mammoth Mart* court. Primarily because no debtor-creditor relationship existed between Larsen and Bennett before Larsen's petition in bankruptcy, she concludes that Larsen's liability for OOE's debt to Bennett *must* arise from a postpetition transaction "with the debtor-in-possession."

This however, is too simplistic an interpretation of the First Circuit's requirement that a creditor's claim arise from a transaction with the debtor-in-possession. It is not enough that the debtor-in-possession take some action that gives rise to a claim: a transaction *between* the creditor and the debtor-in-possession must occur. Consequently, the transaction upon which the *Mammoth Mart* test focuses attention is the transaction that gives rise to a creditor's right of repayment.

The United States Court of Appeals for the Seventh Circuit recently explained the "transaction" requirement in *In re Jartran*, 732 F.2d 584, 587 (7th Cir.1984):

> "To serve the policy of the priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority[.]"

It is clear from the *Jartran* court's decision, and from analysis of the cases construing section 503(b), that a creditor must be a willing party to a transaction with a Chapter 11 debtor in order to gain administrative priority for the resulting claim against the debtor's estate in bankruptcy. This is because Congress intended the grant of such priority to offset a *creditor's* natural reluctance to extend credit to a debtor in bankruptcy, not merely to place at the head of the line any obligation accruing post petition.

Bennett was never a willing party to a transaction with Larsen; Larsen merely exercised her rights under her contract with OOE, thereby assuming liability for certain debts incurred by OOE. Bennett was certainly not induced to deal with the debtor-in-possession Larsen, because Larsen had performed fully her part of her bargain with OOE more than a year before Larsen rescinded the December conveyance. No post-petition action was required from Bennett, nor has she argued that any occurred. It is inconceivable that such an arrangement could be considered a transaction *with* the debtor-in-possession, since the events that created her right to repayment occurred long before the debtor as debtor-in-possession came into existence. This analysis is not altered by Bennett's argument that the events that give rise to her claim against Larsen occurred post-petition. The policy underlying the Code's grant of administrative priority to expenses incurred in preservation of a debtor's estate in bankruptcy contemplates a considered decision by a creditor to deal with a debtor-in-possession. Further, the policy of priority has as its focus the transaction out of which a creditor's right to repayment arises. Here, Bennett's right to satisfaction arises out of prepetition loans made to OOE. Her right against OOE still exists; Larsen's recission of the December conveyance merely added Larsen as a liable party. The policy of section 503 could not possibly be furthered by an award of administrative priority on these facts.

Similarly, Bennett cannot satisfy the second prong of the *Mammoth Mart* test, which requires that "the consideration supporting the claimants' right to payment was both supplied to and beneficial to the debtor-in-possession." 536 F.2d at 954. The uncontroverted evidence at the hearing revealed that Bennett loaned money to OOE so that OOE could purchase gasoline to be sold at the service station. It is evident that neither the cash nor the gasoline purchased was initially supplied to the debtor-in-possession because the transactions took place more than one year before Larsen regained control over the service station. She has made no allegation that gasoline purchased with the loaned funds remained in the storage tanks of the service station when Larsen regained control of the business. Thus, there is no evidence from which this Court could conclude that

Bennett supplied credit or services to the debtor-in-possession.

Even accepting her theory that the proper transaction for the *Mammoth Mart* analysis is the transaction by which Larsen took back control of the service station from OOE, the Court cannot find that Bennett supplied through that transaction any consideration beneficial to the debtor-in-possession. As noted earlier, Bennett was not a·party to the contract recission, but through it was afforded a right of action against Larsen in addition to the right she held against OOE. Although Larsen may have reaped a benefit from her retaking the business, this benefit is not attributable to Bennett's extension of credit to OOE.

Implicit in Bennett's arguments on the *Mammoth Mart* criteria is her contention that any cost incurred by a debtor-in-possession in the course of recovering the assets of her bankruptcy estate should be awarded administrative priority under section 503(b)(1)(A). Bennett, however, cites no authority for such a broad proposition. The authority she cites as on point deals only peripherally with claims arising from post-petition performance of a creditor's obligations under executory contracts with the debtor. See *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443 (Bankr.E.D.Cal. 1982). Here, Bennett had no executory contract with Larsen. Larsen did accept her executory contract with Hugh McGee but, contrary to Bennett's assertions, liability to Bennett did not flow from Larsen's acceptance of that executory contract. Rather, Larsen's assumption of liability on OOE's debt occurred later when Larsen by letter dated 15 June 1984 exercised her contractual right to regain control of the business. For this reason, *Ridgewood* and similar cases that grant administrative priority to amounts due on contracts assumed by a debtor-in-possession are distinguishable on their facts. Plainly, Bennett's claim cannot meet the standards of *Mammoth Mart*.

Bennett argues in the alternative that she holds rights in the proceeds of sale of the service station superior to those of the debtor. This argument rests upon her assertion that a portion of the sale proceeds never passed into Larsen's bankruptcy estate.

Bennett notes that Larsen's recission of the December agreement conveyed to Larsen all stock of OOE and all obligations incurred in conformity with the December agreement, and thus concludes that Larsen's sale of the service station, which she alleges to be "the only asset of the corporation," accomplished a dissolution of OOE by its sole shareholder. Bennett argues that the interest of Larsen's bankruptcy estate in the proceeds of the dissolution cannot exceed the amount remaining after full payment to all corporate creditors. Under this theory, Bennett claims she has a right to repayment from the proceeds of the sale superior to any right to the proceeds held by Larsen.

Without considering the merits of the legal argument, clearly the argument cannot succeed because it fails to assess accurately the facts of this case. The fatal flaw in Bennett's argument is her misassertion that Landmark Mobil was an asset of OOE. Under the December 1983 "Agreement of Conveyance of the Service Station Business t/a Landmark Mobil ...", Larsen conveyed the business to a trust for the benefit of OOE, of which she was trustee. OOE operated the business pursuant to a licensing agreement also contained in the December 1983 document. When OOE failed to honor the covenants contained in the December 1983 document, Larsen rescinded the contract. Under Article III paragraph 2 of the agreement, Larsen's recission immediately terminated the license to operate the service station held by OOE. Under Article IV paragraph 5(c), which details the process of recission, Larsen was to "reconvey title to the trust assets to herself absolutely."

Plainly, OOE never acquired title to the service station under its transaction with Larsen. Thus, although Larsen regained sole title to the business after her recission of the OOE contract, this was not by virtue of her then sole-shareholder status. Rather, Larsen merely retook individual ownership of the service station back from the

trust. As sole shareholder, Larsen acquired all assets held by OOE; the chief asset, however, was the defunct licensing agreement with Larsen.

Once the nature of the Larsen–OOE transaction is apparent, it becomes obvious that Larsen's sale of the service station was not an act in dissolution of OOE, of which Larsen was ultimately the sole shareholder. The inescapable conclusion is that when OOE took possession and control of the service station in March of 1983 under the authority of the pre-incorporation agreement of 21 February 1983, OOE operated under the assumption that it acquired full ownership of the service station, since the preincorporation agreement stated that OOE would assume such ownership. Consistent with this belief, OOE executed with Bennett a document purporting to give her an interest in the equipment at the service station as security for her cash loan to OOE. OOE, of course, was without the power to grant Bennett such a security interest. Furthermore, there is no evidence that she ever perfected this interest, and she has not alleged that she holds a secured status. The parties are in the unfortunate circumstances of never attaining the legal relationship they assumed would ensue. Unforeseeably, that legal relationship has become the pivotal fact in Bennett's recovery against Larsen. This Court is left with the conclusion that Bennett's claim, even if found timely and not otherwise barred, has no priority. Its status, if allowed, would be as a general unsecured claim.

■ Regardless of their priority status, this Court finds further that even if the proofs of claim were timely filed, Bennett has failed to return unauthorized post-petition preferential transfers avoidable under § 549 [3], for which she would be liable under § 550 [4], thus her claims are barred by the terms of § 502(d), which provides that:

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is *recoverable* under section 542, 543, 550, or 553 of this title, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee *is liable* under section 522(i), 542, 543, 550, or 553 of this title (emphasis supplied).

The procedural aspects here are somewhat unusual because the issue of avoidable post-petition preferential payments had not been raised until the current proceedings, in which Larsen raises the bar of § 502(d) as a defense to Bennett's proofs of claim. Arguably, section 502(d) is inapplicable to Bennett's claim because the statute bars only claims from transferees "liable" for the return of "recoverable" property. By the terms of section 550(a) [5], a transferee is "liable", and thus the property is "recoverable", only "to the extent that a transfer is avoided." [6] Undisputably, Larsen has failed to bring an adversary proceeding to recover the allegedly preferential transfers, and therefore the transfer has not been avoided. To date the Court has not adjudicated whether Bennett has received

**3.** § 549 provides in pertinent part:
   (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
     (1) that occurs after the commencement of the case; and
     (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
     (B) that it not authorized under this title or by the court.

**4.** § 550. Liability of transferee of avoided transfer
   (a) Except as otherwise provided in this section, to the extent that a transfer *is avoided* under section 544, 545, 547, 548, 549, 5553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
     (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
     (2) any immediate or mediate transferee of such initial transferee
(Emphasis supplied.)

**5.** *See* note 4 above.

**6.** *Id.*

post-petition preferential transfers avoidable under § 549(a) that must be returned to the estate pursuant to § 550(a). Furthermore, such a proceeding would now be barred by the provisions of Sections 549(d) [7] and 550(e) [8]. Nevertheless, authority does exist for the proposition that an *alleged* preference may be asserted defensively in combination with § 502(d) to defeat a proof of claim. *Matter of Mid–Atlantic Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y.1986). While the statute of limitations may bar an affirmative claim against Bennett, this Court can discern no policy or statutory reason that would prevent Larsen from raising the unreturned preference in defense to Bennett's claims. *See id.* at 609–611. In closing argument, Bennett's counsel admitted her receipt of unauthorized post-petition payments totalling $2,000.00, as listed in the debtor's schedules. Although the U.S. Trustee and debtor's counsel both demanded the return of these payments, Bennett has provided no proof of compliance with these demands. As such, this Court can only conclude this creditor has received and retained post-petition preferential transfers to which she is not entitled and, therefore, even if filed timely, her proofs of claim must be disallowed under § 502(d) unless she returns $2,000.00 to the debtor's estate.

In summary, the Court must find that Bennett's proofs of claim were untimely filed. Bennett has not shown cause why this Court should extend the time for filing, thus her claims must be disallowed. Furthermore, such claims are not entitled to priority status and, if allowed, must be found to be unsecured. Finally, Bennett has received a post-petition preferential transfer that she has not returned to the debtor's bankruptcy estate, thus her claims must also be disallowed on this additional ground. For the foregoing reasons, the

motion to strike Bennett's proofs of claim is granted.

An appropriate order will issue.

---

7. § 549 provides:
  (d) An action or proceeding under this section may not be commenced after the earlier of—
    (1) two years after the date of the transfer sought to be avoided; or
    (2) the time the case is closed or dismissed.

8. § 550 provides:
  (e) An action or proceeding under this section may not be commenced after the earlier of—
    (1) one year after the avoidance of the transfer on account of which recover under this section is sought; or
    (2) the time the case is closed or dismissed.