**In re DART DRUG STORES, INC., Debtors.**

**Bankruptcy Nos. 89–4–2347–PM to 89–4–2357–PM.**

United States Bankruptcy Court, D. Maryland, at Rockville.

Dec. 10, 1991.

Deborah Devan, Baltimore, Md., for movant, Gen. Elec. Co.

Duane D. Morse, Washington, D.C., for debtors.

## MEMORANDUM OF DECISION

(Motion for Allowance of Administrative Expenses Filed by General Electric Company)

PAUL MANNES, Chief Judge.

Before the court is the application of the General Electric Company for the allowance of an administrative claim under 11 U.S.C. § 503(b)(1)(A). That section provides:

**§ 503. Allowance of administrative expenses**

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) The actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case.

The motion is opposed by the debtor in possession.

Dart Drug Stores, Inc. ("DART") was a publicly held chain of retail drug stores that was the subject of a leveraged buyout

in 1984. At a later date, a second ownership group took over and was unable to deal with massive levels of debt in the face of a diminished market share and intense competition in its markets. The debtor has shut down its retail operations.

The movant, General Electric Company ("GE") is an unsecured creditor and a member of the Official Committee of Unsecured Creditors. The significance of this motion is that if the within claim is allowed as an administrative claim, GE achieves a priority status to the detriment of creditors without security. Therefore, the alignment of the parties is not so much DART versus GE but DART as representative of the unsecured creditor body against GE, because, to the extent that the claim is disallowed as an administrative claim, it will be allowed as an unsecured claim *pari passu* with other unsecured creditors.

The issue before the court is unique in that it was allowed to fester and become difficult to resolve because of a prolonged hibernation on both sides. It is incomprehensible that both GE and DART would have let this issue lie unresolved by not following up upon the terms of an agreement made October 20, 1989, between responsible officers on both sides. That agreement called for the ascertainment of a level of the consigned stock of what are called GE Large Lamps that was in DART's stores and warehouses on August 8, 1989, the date that the debtor filed its petition under Chapter 11 of the Bankruptcy Code. The issue for the court to determine is what was the level of DART's GE Large Lamp inventory on that date?

### THE FACTS

GE and DART had a business relationship for well over 20 years. On July 1, 1984, GE and the debtor entered into another consignment agreement whereby GE as consignor maintained the Large Lamp stock in debtor's stores and warehouses held for sale to the debtor's customers. Under the terms of the consignment agreement, GE retained ownership of the lamps until sale. The agreement was automatically renewed from year to year. Payment was to be made each month when lamps were sold. Payment would come either at the time lamps were purchased or when DART took an itemized inventory. The amount of the payment was made based upon withdrawals from consigned stock ("The withdrawals from consigned stock shall be measured by the difference between the value of the previous consigned stock plus shipments made since the previous inventory pursuant to Distributors Orders and the value of such inventory.").

Following the filing of a petition under Chapter 11 of the Bankruptcy Code, GE and DART entered into discussions leading to the post-petition consignment agreement dated October 20, 1989, and filed herein as an attachment to GE's Exhibit No. 1 ("Agreement"). The letter states in part at page 2:

> Over a period of several years prior to the filing of its petition, Dart reduced the stock of consigned inventory by ordering fewer replacement untis than it sold. Since GE was paid only to the extent that Dart ordered replacement units, this reduction in consigned inventory resulted in a debt owed to GE for Large Lamps sold during the prepetition period. The amount of that debt is equal to the value of the inventory originally consigned to Dart minus the value of the consigned inventory that was on hand as of the petition date.

It was acknowledged by all concerned that the consigned inventory was substantially less than the "book" inventory shown, for example, on GE's Exhibit No. 3 of $758,920.41. This was caused by the closing of eleven DART stores, the termination of the Dart Home Center operation, the general reduction of inventory, and the downsizing of the DART operation in general. Because of DART's pre-filing cash problems, orders were not placed that would have brought the inventory up to "book," nor would reordering have been desirable because of the drastically diminished size of the operation.

Both sides understood that the actual inventory was substantially less than "book." Therefore, there was provided at

paragraph 3 of the Agreement the following language:

3. *Consignment of Large Lamps.* The existing consignment arrangement will be cancelled and GE and Dart will enter into a new consignment arrangement as follows:

a. Dart will ascertain the level and value of the consigned stock of GE Large Lamps that was in Dart's stores and warehouse on the petition date (the "Petition Date Consigned Stock") by taking a physical inventory of GE Large Lamps and adding to it the numbers and values of Large Lamps sold by Dart since the petition date, as indicated by Dart's point-of-sale computer system records.

b. To the extent the value of the stock of Large Lamps consigned to Dart, as shown on GE's books, exceeds the value of the Petition Date Consigned Stock, GE shall have an allowed prepetition unsecured claim.

c. Upon execution of this letter agreement by both parties, Dart will pay GE for all Large Lamps sold since the Petition Date, as indicated by Dart's point-of-sale computer system records.

d. Upon execution of this letter agreement by both parties, Dart may order and GE will deliver Large Lamps to replace consigned stock sold since the Petition Date (the "Initial Replacement Order").

Contrary to what was contemplated, what followed was that neither party followed up policing this provision regarding inventory. At trial, DART offered in evidence as its Exhibit No. 3 a document purporting to show that the value of the inventory that date was in the sum of $123,302. That, added to the calculation of actual sales of Large Lamps taken from sales terminals, demonstrated an inventory as of the date of the filing of the petition of $244,572. DART's marketing department, charged with the responsibility of ascertaining the inventory, never passed the information on to its Accounts Payable Department that was charged with paying the monthly bills. That department blithely kept on paying the bills and returning the GE lamp reports showing the "book" inventory that everyone knew was incorrect.

The difficulty with this, and what made it particularly awkward for DART, was that it had no record of forwarding its Exhibit No. 3 to GE at any time prior to February 13, 1991, when it was transmitted by facsimile transmission to the office of counsel for GE. George E. Loney, through whom Exhibit No. 3 was offered, was no longer employed by DART, although that has no significance to the admissibility of the document in and of itself. The document was found in the GE file kept at the office of DART. It is lamentable, considering the alleged talents of the DART management and its counsel that this document saw daylight so late in the history of this case.

■ DART offers Exhibit No. 3 under two possible exceptions to the hearsay rule: Federal Rules of Evidence 803(6) and 803(24). The court will not admit the record as one of a regularly conducted activity under Rule 803(6). There is nothing in the record to establish that it was a regular practice of DART to make these reports. Years had passed since any similar report had come to light. On the other hand, DART also urges as another basis under Rule 803(24) that provides:

**Rule 803. HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL**

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

*Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the propo-

nent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The Fourth Circuit has recognized the admissibility of evidence pursuant to Rule 803(24) in various contexts.

In *United States v. Simmons*, 773 F.2d 1455 (CA4 1985), the defendant appealed his conviction of possessing firearms after being previously convicted as a felony. In attempting to prove that the defendant possessed the weapons in interstate commerce, the government offered into evidence two firearm trace forms of the Bureau of Alcohol, Tobacco and Firearms. Testimony established that the trace is a routing ATF procedure, whereby the agency contacts the manufacturer of a weapon and requests its record custodian to complete, sign, and date an ATF form. The form verifies the place where the weapons were manufactured as well as the date and place of initial distribution. In affirming the district court's holding, the court stated:

> We agree with Simmons that the ATF forms are not business records within the meaning of Rule 803(6). These forms were neither made for a regular business purpose by the manufacturer nor completed at the time the weapons were manufactured, shipped, or sold. Moreover, the records were not kept in the regular course of the ATF's business at the time of manufacture or shipment.

*Simmons*, 773 F.2d at 1458, n. 4. However, the court continued,

> We find that the ATF trace forms meet all of the requirements of Rule 803(24). In the first place, the forms were clearly offered as evidence of a material fact to prove the place of manufacture. Moreover, the district court found that the forms were more probative than any other evidence which could be reasonably procured, when it determined that it was not reasonable to require the government to bring in the record custodians

from different parts of the country to proved this simple fact. Furthermore, as the district court concluded, there is simply no reason for the manufacturers to falsify the entries on the routine ATF forms. The forms thus have the circumstantial guarantees of trustworthiness, equivalent to the other hearsay exceptions under Rule 803, and their admission serves the general purposes of the rules and the interests of justice.

*Id.* at 1459.

In *Kay v. United States*, 255 F.2d 476 (CA4 1958), on appeal of a reckless and drunken driving conviction, the court upheld the admission, pursuant to a Virginia statutory scheme, of a certificate that showed the level of alcohol in the defendant's blood:

> The power of Congress and of a state legislature to provide for the admission of evidence is not subject to any such arbitrary limitation as the defendant supposes. They may carve out a new exception to the hearsay rule, without violating constitutional rights, where there is reasonable necessity for it and where it is supported by an adequate basis for assurance that the evidence has those qualities of reliability and trustworthiness attributed to other evidence admissible under long established exceptions to the hearsay rule.

*Kay*, 255 F.2d at 480–81.

In the instant case, mindful of the short amount of time given to GE to prepare to meet the contents of this document, the court offered to put the case over a sufficient time to enable GE to do whatever it desired to do to meet the statement. That offer was refused. Contrary to the statement contained in GE's post-hearing memorandum (D.E. 1151), there were means available to probe the verity of the exhibit.

In all events, the court finds that the statement meets the exceptional circumstances required for the admission of a document not otherwise admissible. Its trustworthiness is founded in part upon the proposition that the statement must have been created on the date stated. It bears a date when such a statement was anticipat-

ed by all parties in interest. It dovetailed with the payment made at that time by DART to GE to cover those sales made in the period between the filing of the petition and the effective date of the Agreement (GE Exhibit No. 1).

The author of the DART document clearly had the responsibility for picking up all of the inventory recapitulation submitted. Viewed in the surrounding circumstances, and the lack of any incentive whatsoever on the part of witness Loney to tender a false document, the fact that the document was found in a logical place, that is the GE file, and the absence of any other indication of interest, bias, corruption, or coercion, the court will admit the statement into evidence.

■ The doctrine of estoppel invoked by GE is without merit in this situation. First of all, the party whose conduct is raised as justifying estoppel is not the party that would bear the consequences of the implementation of that doctrine. *See, Savonis v. Burke*, 241 Md. 316, 216 A.2d 521 (1966). There is utterly no foundation in the record for the assertion that DART misled GE. Furthermore, there is no evidence as to any damage caused by reliance upon the figures that GE knew to be flawed from the date of the inception of this bankruptcy case.

■ GE's motion for allowance of administrative claim fails for want of proof. There is no evidence other than the admittedly flawed statement of the "book" value of the inventory that the actual Large Lamp inventory held by DART at the time of the filing of this case on August 8, 1989, was at the level as GE would have the court believe. GE has simply not met that burden. As was stated by the Sixth Circuit in the case of *In re United Trucking Service, Inc.*, 851 F.2d 159, 161–62 (CA6 1988),

> A creditor such as TRC [GE] seeks to characterize its claim against the debtor as an administrative expense in order to enjoy first priority in payment under § 507(a)(1). *See, e.g., In re Baldwin–United Corp.*, 43 B.R. 443 (S.D.Ohio 1984). The purpose of these provisions of the Bankruptcy Code is to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976). Only those debts, however, that arise *after* the filing of the bankruptcy petition may be accorded administrative expense status. *See id.* at 954–55; *Baldwin*, 43 B.R. at 453.

In order to qualify a claim for payment as an administrative expense

> a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. [*In re Mammoth Mart, Inc.*, 536 F.2d] at 954.
>
> A creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a prepetition debtor, then consideration was given to that entity rather than to the debtor-in-possession. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority. *Id.* at 586.

*In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987) (footnote omitted). Application of the *White Motor* test to this case would impose upon TRC [GE] the burden of providing its entitlement to priority under § 503.

The *Mammoth Mart* test was restated in this circuit in the case of *In re Larsen*, 80 B.R. 784, 787–88 (BC E.D.Va.1987). GE does not meet the test of showing that the debt arose from a transaction with the debtor-in-possession. The transaction arose as the result of the pre-petition activity of DART. Nor could GE meet the other prong of the *Mammoth Mart* test that the consideration supporting its right to payment was supplied to and benefitted the debtor-in-possession. All that GE can show

is that the predecessor of the debtor-in-possession owed it money. It has a pre-petition claim and no more.

The court will enter an order denying the application for allowance of administrative claim.