## In re DREXEL BURNHAM LAMBERT GROUP INC., et al., Debtors.

Bankruptcy Nos. 90 B 11646 to 90 B 11660.

United States Bankruptcy Court, S.D. New York.

May 24, 1991.

S.E. Mayerson and S. Balasiano, of Kelley Drye & Warren, New York City, for Deutschman Clayton & Co. ("DDC").

J.J. Rapisardi and A.C. Rogoff, of Weil, Gotshal & Manges, New York City, for Drexel Burnham Lambert Investors Corp. ("Investors").

## MEMORANDUM OF DECISION ON ADMINISTRATIVE EXPENSES UNDER §§ 503(b) and 507(a)(6)

FRANCIS G. CONRAD,* Bankruptcy Judge.

Standing before us is the unresolved part of a motion[1] that was originally filed by this Court by Ward, C.J. July 10, 1984. This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes find-

---

* Sitting by special designation.

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to

DCC on August 31, 1990, and in which DCC sought to compel Investors to assume or reject certain executory contracts [2] between DCC and Investors, and directing that all payments, due through the date of rejection of the contracts be paid promptly as administrative expenses under 11 U.S.C. § 503(b). By order Dated October 18, 1990, we established that the Funding Agreements [3] were executory contracts, and authorized their rejection by Investors. We held the rejection of the Funding Agreements was without prejudice to the rights of any party to challenge the status of any claims or damages arising out of that rejection as administrative expenses under 11 U.S.C. §§ 503(b) and 507(a)(1). DCC filed a proof of claim for $828,493. Clayton Reply Aff.[4] ¶ 1. Investors objects to the amount of the claim and maintains it approximates only $98,660. Investors' Mem. at p. 7, Biddleman Aff.[5] ¶ 9. The roots of this matter are the Funding Agreements and the relationship between the parties prior to and after the filing of the Chapter 11 petition.

DCC operates an investment fund with the primary purpose of identifying, reviewing, completing, and managing leveraged buy outs ("Fund"). Fund consists of $125,000,000 in commitments from three classes of investors: the general investors ($3,750,000); the special investors ($15,625,000); and, the institutional investors ($105,625,000). Debtor is one of the special investors and the sole institutional investor. Clayton Aff.[6] ¶ 2.

By "Consent and Release" Agreement dated November 21, 1989 ("Assignment"), Debtor became a successor in interest to the Funding Agreements with DCC: (1) Special Investor Funding Agreement, dated March 26, 1987, App. Ex. B, which contains an obligation to fund until March, 1994, a portion of the operating expense of DCC and a right to participate in equity offerings of the Fund in the amount of $8,250,000; and, (2) Institutional Investor Funding Agreement, dated March 25, 1987, App. Ex. C, which contains an obligation to fund until March, 1994, the majority of the operating expense of DCC and, the right to participate in equity offerings of the Fund in the amount of $105,625,000.

DCC claims Investors agreed to commit 94% of the day-to-day operating expenses incurred by DCC in managing completed acquisitions, identifying potential acquisitions and providing equity capital for leveraged acquisitions until March of 1994. Clayton Reply Aff. ¶ 6. Investors disagrees. Investors maintains its liability is limited to operating expenses incurred while DCC attempted to locate various leveraged buy-out (LBO) investor opportunities. Biddelman Aff. ¶¶ 4–5.

To support its argument, DCC cites language from the Funding Agreements:

We understand that [DCC] ... proposes to form an investment fund (the "Fund") in which selected investors will participate. We understand that [DCC] will identify existing privately or publicly owned businesses or separable asset or product lines (a "target") in which Fund participants will directly or indirectly invest. . . .

This letter agreement will set forth the terms and conditions upon which (A) we agree to purchase securities to be issued

---

ings of fact and conclusions of law under F.R.Civ.P. 52 as made applicable by the Rules of Practice and Procedure in Bankruptcy.

**2.** Any reference to executory contracts is to the Special Investors Agreement dated March 26, 1987 by and between DCC and Investors, as successor in interest to Denslow Financial Associates, and to the Institutional Investors Agreement dated March 25 1987 by and between DCC and Investors, as successor in interest to Kingsly Partners ("Funding Agreements").

**3.** *Supra,* footnote 2.

**4.** References to "Clayton Reply Aff." are to the affidavit of Everett M. Clayton, III, dated 1/4/91, in reply to Investors' opposition to DCC's Motion. Clayton is a principal of DCC.

**5.** References to "Biddleman Aff." are to the affidavit of Paul A. Biddleman, dated 12/17/90, in opposition of DCC's Motion. Biddleman holds a position of Managing director of Drexel Burnham Lambert, Inc. ("DBL", "Drexel").

**6.** References to "Clayton Aff." are to the affidavit of Everett M. Clayton, III, dated 8/28/90, in support of DCC's motion.

by the companies to be organized by [DCC] in connection with the acquisition of Targets and to pay the operating expenses of [DCC] and (B) [DCC] agrees to share with us investment banking and other fees earned by [DCC] in connection with the activities of the Fund.

Clayton Reply Aff., Ex. A and B, at 1.

The Funding Agreements further mandate the acquisitions will be facilitated through a new corporate entity or entities ("Newco") or through a separate limited partnership that will control Newco. Clayton Reply Aff., Ex. A and B, at 2.

As to managing Newco, the Funding Agreements provide:

We understand that [DCC] will enter into a management arrangement with each Newco providing for the direction of Newco's operations. These arrangements will provide for the payment of fees to [DCC]. We also understand that the contracts to be entered into in connection with the acquisition of specific Targets may provide for the payment of investment banking and other fees to [DCC]. These fees will be applied and shared as prescribed in Section IV below.

Clayton Reply Aff., Ex. A and B, at 4.

Section IV, entitled "[f]ees and [e]xpenses of [DCC]", provides:

We understand and agree that the operating expenses of [DCC] shall be borne by the Institutional Investors and the Special Investors, including us, in proportion to our respective commitments to the Fund. Such expenses shall include, among others, salaries, overhead, out-of-pocket expenses, fees and disbursements of counsel and other professionals, and fees and expenses associated with potential acquisitions, including option fees and financing commitment fees (collectively, "Expenses"). We understand that the Fund's annual budgets and general expenditures will, as discussed above, be reviewed and approved by the Board of Advisors.

Accordingly, we hereby agree to pay that percentage of the Expenses that is equal to the amount of our commitment hereunder divided by $121.25 million.

Such payment will be made when and as Expenses are billed by [DCC]. We understand that [DCC] currently intends to bill for expenses it advances as of the date hereof and each June 30 and December 31 hereafter.

You and we and other investors have agreed that investment banking and management fee income in excess of Expenses from time to time earned by [DCC] shall be used to repay the Institutional and Special Investors, including us, amounts theretofore paid [DCC] for Expenses. All investment banking and fee income of [DCC] in excess of such repayments will be shared by [DCC] and the Special Investors in proportion to their respective commitments to purchase Newco Common Stock (*i.g.*, 37.5% to [DCC] and the balance to Special Investors).

Clayton Reply Aff., Ex. A and B, § IV, at 5.

DCC maintains Investors was presented with the operational budget for 1990, which expressly included amounts for managing the Portfolio Companies. DCC also maintains Investors did not object to its share of the approximately $2.8 million in Expenses, and, on December 31, 1989, paid the bill for half of the Expenses ($1.4 million) for the period of January 1, 1990 through June 30, 1990. Clayton Reply Aff. ¶ 7. DCC also maintains that no surplus existed in 1990; therefore no set-off could be made to reduce Expenses paid by Fund Investors. *Id.*

DCC reached an agreement on five acquisitions, two of which were completed: The Cherokee Group ($175 million purchase price) ("Cherokee"); and, Faire Lanes, Inc. ($200 million purchase price) ("Faire Lanes"). Thus, Investors owns indirectly common stock in Cherokee. Clayton Aff. ¶ 9. Prior to a pre-petition transfer of its interests in Faire Lanes to Drexel Burnham Lambert MBI Corp. ("DBL MBI Corp."), Investors owned various interests in Faire Lanes. These interests were an indirect ownership of common stock in Faire Lanes, and a direct ownership of preferred stock in Faire Lanes.

DCC claims it invested a great deal of time in managing Investors' positions, *e.g.*, Jeffrey Deutschman, a principal of DCC, spent most of the four months preceding the filing of DCC's motion, "structuring, planning and implementing a common stock offering for Cherokee." Clayton Aff. ¶ 10. DCC claims Cherokee has increased in value since the acquisition and, its operating income is 30% ahead of the LBO plan. Clayton Reply Aff. ¶ 9. Clayton admits the initial public offering in August 1990 has been postponed due to the financial market's adverse conditions, but claims "[w]hen the offering is completed, the Fund's investment in Cherokee will be significantly more liquid, and the substantial unrealized gain will be protected from a slowdown in the United States economy." Clayton Aff. ¶ 10. Based on the August 1990 public offering, Investors' position in Cherokee is valued at $5.5 million. Clayton Reply Aff. ¶ 9. DCC's argument that its efforts are providing ongoing value to Investors' estate, *id.*, is not contested by Investors.

DCC claims that effort was put into restructuring Faire Lanes, that upon completing the restructuring of its indebtedness, "DCC will have successfully protected the Fund's investment in Faire Lanes" and, thus provided an ongoing value to Investors' estate. Clayton Aff. ¶ 10. DCC also maintains that it restructured Faire Lanes' business operations, brought on a new management and had an agreement in principle to restructure its capital. Clayton Reply Aff. ¶ 9. Investors denies any value attributed to that investment by DCC. Investors claims the present value of the cost of the investment was written down to zero on Investors' books, and that because it holds common stock, the new proposed restructuring, which will benefit first the holders of the preferred stock, has little or no value to Investors today. Chapus Aff.[7] ¶¶ 5 and 7.

Investors opposes classifying DCC's claim as an administrative priority claim. For proof Investors produces Bachelor and Biddelman. Bachelor, Debtor's employee and a participant in a meeting prior to Investors' filing with Clayton and Deutschman, DCC's principals, declares "[t]he entire thrust of the meeting, as well as Investors' overall negotiations with DCC, was to achieve a settlement and termination of Investors' relationship with DCC and Investors' liability under the Funding Agreement." Bachelor Aff.[8] ¶ 2. Biddelman, a managing director of Drexel Burnham Lambert, Inc. (DBL), gives a somewhat similar statement: "[p]rior to May 29, 1990, as a result of DCC's unreasonable termination demands to resolve Investors' obligation under the Funding Agreements, Investors indicated that DCC should not undertake any further actions on its behalf with respect to future acquisitions under the Funding Agreements." Biddleman Aff. ¶ 11. In fact, during the three month period between DBL's filing and Investors' filing,[9] Investors terminated almost all of its arrangements with various funds and was attempting to negotiate a termination with DCC. Bachelor Aff. ¶ 3.

Bachelor avers to DCC's affirmative and forceful negotiations to terminate the Funding Agreements:

Following the commencement of Investors' chapter 11 case on May 29, 1990, [he] had no further conversations of substance with either of the principals of DCC. [He] made no assurances to DCC concerning the continued viability of either the Funding Agreements on Investors' relationship with DCC. In that regard, [he] did not discuss what, if any,

---

7. References to "Chapus Aff." are to the affidavit of Jean–Marc Chapus, dated 2/7/91, in support of Investors' opposition to DCC's Motion. Chapus holds the position of First Vice President of DBL, of which Investors is an affiliate.

8. References to "Bachelor Aff." are to the affidavit of Herbert Bachelor, dated 2/8/91, in support of Investors' opposition to DCC's Motion. Bachelor is an employee of DBL.

9. DBL filed the Chapter 11 petition on February 13, 1990. On May 29, 1990, 14 subsidiaries filed Chapter 11. Two involuntaries were filed. All of these cases are jointly administrated for procedural purposes only. Drexel Burnham Lambert Realty Corp., Inc. ("Realty") filed for protection on 1/23/91. Realty is not jointly procedurally administered.

services were being provided by DCC to Investors or any of the other limited partners of the DC Partnerships, nor did [he] request that any services be provided by DCC to Investors under the Funding Agreements or otherwise. Contrary to Mr. Clayton's assertion, [Bachelor] did not indicate that DCC should continue to operate 'in the ordinary course' of its business insofar as Investors was concerned.

Bachelor Aff. ¶ 5. Bachelor adds that in a telephone call with Clayton after May 29, 1990 regarding the payment of June expenses, he "did not indicate whether or not Investors would pay the June bill, and [Bachelor] stated that [Bachelor] did not know what effect Investors' bankruptcy would have on the status of the Funding Agreements." Bachelor Aff. ¶ 6. This conversation was confirmed by letter. Bachelor Aff., Ex. 1. Bachelor insists any actions taken by DCC "were not undertaken at the express request or inducement of Investors." Bachelor Aff. ¶ 7. He avers:

> [He] did not affirmatively induce DCC to take any actions to preserve or enhance the value of the DC Partnerships on Investors' behalf. Moreover, [he] did not affirmatively induce DCC to continue a business relationship with Investors; to have done otherwise would have contradicted the clear intention of the negotiations with DCC which had been to terminate such relationship.

*Id.* at ¶ 8.

DCC has a different version. In the two meetings among Deutschman, Clayton and DBL's Biddleman and Bachelor, DCC claims:

> [N]egotiations focused on two possibilities, settlement and/or Drexel's continued association with DCC. During the negotiations, Mr. Bachelor stressed that since Drexel (Drexel Burnham Lambert Group, Inc. had already filed for bankruptcy) was planning to emerge from bankruptcy as a scaled down investment banking firm, DCC could be a material player in Drexel's reorganization and a vehicle through which the reorganized

entity would invest. Mr. Bachelor made it clear that Drexel was considering continuing to do business with DCC in bankruptcy and urged us to consider how this could be effectuated. Moreover, Mr. Bachelor discussed the possibility of obtaining "quick bankruptcy court approval," if necessary, to allow DCC to begin investing funds for Drexel during Drexel's reorganization. The negotiations were moving exceedingly well, and as one of the settlement conferences in New York on Friday, May 19, 1990, was winding down, Mr. Bachelor, assured us that we were very close to settlement and that we should speak to him on Monday so as not to lose the momentum.

Clayton Reply Aff. ¶ 12.

In a June 1990 telephone call from Clayton, immediately after Investors' filling, Bachelor:

> [I]ndicated that nothing had essentially changed, but because of the filing, [Investors] was unable to discuss either a settlement or the terms of our continued relationship until it fully understood the requisite bankruptcy procedures. He urged us to hold on until he could sort out the bankruptcy issues, and upon this inducement, we continued to do so.

Clayton Reply Aff. at ¶¶ 14–15.

DCC claims Investors continued to evade DCC's telephone calls. Clayton tagged Bachelor in June of 1990, but only after Investors received the expense bill for the second half of 1990. Clayton claims Bachelor's response was that nothing could be done until Investors' bankruptcy lawyers resolved matters.

> [T]herefore [Bachelor's] hands were tied. At no time did [Bachelor] ever tell us to stop managing the Portfolio Companies, and the clear implication of his conversation was that [DCC] should continue in the ordinary course until the bankruptcy issues could be resolved and our discussion could continue.
>
> DCC naturally took this inaction, coupled with the previous inducements by Mr. Bachelor and the fact that [Investors] divested its interest in all its other partnerships, as evidence that [Investors]

continued to believe that the investments it held in the Portfolio Companies were beneficial to its estate. Moreover, DCC truly believed that [Investors] would at the very least fund the Expenses of DCC through 1991 to enable DCC to continue to monitor deals, manage the Portfolio Companies properly, and try to obtain new financing to replace [Investors]. After all, Mr. Deutschman and I had *close relationships with Drexel's management for approximately ten years* which continued the basis of the formation of the Fund and for *our continuing confidence that Drexel would deal with us fairly even after the bankruptcy filing....* [Investors' desire to reject the agreements, as evidenced in its response to Motion] was directly contrary to all our conversations with Mr. Bachelor both prior to and after the filing of [Investors'] bankruptcy petition. Clayton Reply Aff. at ¶¶ 15–16. (emphasis ours/added).

DCC admits that it had stopped any activity as an identifier of good investments, but claims the expenses incurred by it during the five month period between the bankruptcy occurrence and the rejection of the Funding Agreements, *i.e.*, maintaining its employees and the nature of its operations, could have been avoided. Clayton Reply Aff. at ¶ 17.

▉ To determine and address DCC's entitlement to an administrative priority status, we must turn to §§ 502(g), 503, and 507 of the Bankruptcy Code. There is no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its intentions. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

Section 502(g) provides:
A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g). Stated succinctly, § 502(g) mandates that a claim arising from rejection of an executory contract are treated as a pre-petition claim.

Section 507 governs the priorities of expenses and claims and provides in pertinent part:
(a) The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

11 U.S.C. § 507(a)(1).

Section 503 of the Bankruptcy Code, entitled "[a]llowance of administrative expenses", provides in pertinent part:
(a) An entity may file a request for payment of an administrative expense.
(b) After a notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case ...

11 U.S.C. §§ 503(a) and (b)(1)(A).

"The phrase 'actual, necessary' has been interpreted to mean those expenditures of the trustee for the cost of operating a business, ... for taxes and other costs incidental to the protection and conservation of the estate." *In re Gamma Fishing Co., Inc.*, 70 B.R. 949, 953, 16 C.B.C.2d 996, Bankr.L.Rep. (CCH) ¶ 71711 (Bankr. S.D.Cal.1987) (citing *In re Hilburn*, 62 B.R. 597, 600 (Bankr.N.D.Miss.1986)).

Only expenditures which clearly benefit the estate will be afforded administrative expense status. *Trustees Amalgamated Insurance Fund v. McFarlin's*, 789 F.2d 98, 101, 14 C.B.C.2d 1075, Bankr.L.Rep. ¶ 71096 (2d Cir.1986); *In re Chateaugay*

*Corporation,* 102 B.R. 335, 353, 19 B.C.D. 1102, 21 Collier Bankr.Cas.2d 135 (Bankr. S.D.N.Y.1989) citing 3 L. King, C. Cyr, H. Minkel, R. Rogers, Henry Sommer, W. Taggart, A. Winkler *Collier on Bankruptcy,* ¶ 503–03 (15th ed. 1989); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Services, Inc.),* 23 B.R. 104, 121 (Bankr. S.D.N.Y.1982).

■ Strict construction of the terms "actual" and "necessary," serves to keep "administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors". *Otte v. United States,* 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974); *In re O.P.M. Leasing Services, Inc., supra,* 23 B.R. at 121; *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.),* 851 F.2d 159, 164, 18 B.C.D. 64, 19 C.B.C.2d 542, Bankr.L.Rep. (CCH) ¶ 72367 (6th Cir.1988). The inclusion of the words "actual" and "necessary" in § 503(b)(1) means the estate must accrue a real benefit from the transaction, before administrative expense priority will be granted on claims against the estate. *In re Subscription Television of Greater Atlanta,* 789 F.2d 1530, 14 Bankr.Ct.Dec. (CRR) 833, Bankr. L.Rep. (CCH) ¶ 71159 (11th Cir.1986). The estate must have actually benefitted, as opposed to potentially benefitted. *In re Carmichael,* 109 B.R. 849, 851 (Bankr. N.D.Ill.1990).

> Creditors are presumed to act primarily in their own interests and not for the benefit of the estate as a whole, *In re United States Lines, Inc.,* 103 B.R. 427, 430 (Bankr.S.D.N.Y.1989), and the case law is clear that efforts undertaken by a creditor solely to further [its] own self-interest … will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate. *In re Lister,* 846 F.2d 55, 57 (10th Cir.1988).

*Home Savings Ass. of Kansas City v. Woodstock Associates I, Inc. (In re Woodstock Associates I, Inc.),* 120 B.R. 436, 451 (Bankr.N.D.Ill.1990).

A Court is not limited to the specific examples of claims set forth in § 503(b).

While it is true that the court is not free to fashion additional priorities it ought not be assumed that the six designations are necessarily exclusive nor designed to cover every conceivable situation. The use of the word "including" as the last word in the lead-in sentence of section 503(b), in accordance with section 102(3), is not limiting. Section 102(3) states that the words "includes" and "including" are not limiting. A court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b). Further, what constitute actual and necessary costs and expenses of preserving an estate might well be open to judicial construction.

3 *Collier On Bankruptcy,* ¶ 503.03, at page 503–17 (15th ed. 1989). (footnotes omitted).

It is well-established in this Circuit that priorities are to be narrowly construed, "[i]f one claimant is to be preferred over others, the purpose should be clear from the statute." *Trustees of the Amalgamated Ins. Fund v. McFarlin's Inc., supra,* 789 F.2d at 101 (quoting, *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)). *See also, United Merchants and Manufacturers, Inc. v. J. Henry Schroder Bank (In re United Merchants and Manufacturers, Inc.),* 597 F.2d 348, 349, 5 B.C.D. 241, 20 C.B.C.2d 494, Bankr.L.Rep. (CCH) ¶ 67110 (2d. Cir.1979); *In re Chateaugay Corporation,* 115 B.R. 760, 771 (Bankr.S.D.N.Y.1990); *In re Chateaugay Corporation, supra,* 102 B.R. at 353, *aff'd,* (Bankr.S.D.N.Y. March 29, 1990); *In re United Department Stores, Inc.,* 49 B.R. 462, 465, 13 C.B.C.2d 829, Bankr.L.Rep. (CCH) ¶ 70597 (Bankr. S.D.N.Y.1985); *In re Jartran, Inc.,* 732 F.2d 584, 586–87, 11 B.C.D. 1181, 10 C.B.C.2d 1069, Bankr.L.Rep. (CCH) ¶ 69831 (7th Cir.1984); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir.1976); *In re Amfesco Industries, Inc.,* 81 B.R. 777, 785–86 (Bankr.E.D.N.Y.1988).

■ A bankruptcy court is without discretion or authority to deviate from the Code's narrow list of priorities on purely

equitable grounds. *In re Chateaugay Corporation, supra,* 115 B.R. at 772; *In re Lockwood Enters., Inc.,* 54 B.R. 829, 832 (Bankr.S.D.N.Y.1985). *See generally, In re Amfesco Industries, Inc.,* 81 B.R. at 785; *In re Baldwin–United Corporation,* 43 B.R. 443, 456–57, 11 C.B.C.2d 1391 (Bankr.S.D.Ohio 1984).

■ The burden of establishing entitlement to priority rests with the claimant and "should only be granted under extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate." *In re Amfesco Industries, Inc., supra,* 81 B.R. at 785. *See In re Chateaugay Corporation, supra,* 102 B.R. at 353; *In re O.P.M. Leasing Serv., Inc.,* 60 B.R. 679, 680 (Bankr.S.D.N.Y.1986). A clear relationship between the expenditures made and the benefit conferred on the estate must therefore be shown by the movant. *In re Chateaugay Corporation, supra,* 115 B.R. at 772; *In re Chateaugay Corporation,* 102 B.R. at 353–54; *In re O.P.M. Leasing Services, Inc., supra,* 60 B.R. at 680; *In re Woodstock Associates I, Inc., supra,* 120 B.R. at 451 ("a creditor's right to payment will be afforded priority only to the extent the estate was benefited in fact from the consideration supporting the creditor's claim.").

"The criteria for determining whether a claim qualifies for administrative priority are set forth in *In re Mammoth Mart, Inc.,* 536 F.2d at 950, a seminal case decided under the former Bankruptcy Act but equally applicable under the Code." *In re Chateaugay Corporation, supra,* 102 B.R. at 353. The Court in *Mammoth Mart* set a two prong test for the entitlement to administrative priority: a claimant must demonstrate that the obligation in question (i) arose from a transaction with the debtor-in-possession and (ii) resulted in a direct benefit to the estate. *In re Mammoth Mart, Inc., supra,* 536 F.2d at 954. *See, Trustees of Amalgamated Insurance Fund v. McFarlin's Inc., supra,* 789 F.2d at 101; *In re Chateaugay Corporation, supra,* 102 B.R. at 353; *In re Baths Internation-*

*al, Inc.,* 25 B.R. 538, 9 B.C.D. 1316 (S.D.N.Y.1983), *aff'd,* 31 B.R. 143, 10 B.C.D. 1214, 8 C.B.C.2d 1130 (S.D.N.Y.1983); *In re Jartran, Inc., supra,* 732 F.2d at 587. This test is premised upon two fundamental policies underlying federal bankruptcy law, equality of distribution and rehabilitation of the debtor's business. *In re Chateaugay Corporation, supra,* 102 B.R. at 354. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 658 F.2d 1149, 1163 (7th Cir.1981), *cert. denied, Railway Labor Executives' Assn. v. Ogilvie, Trustee* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982) (general rule is equality of distribution; deviation must appear in the statute).

■ The burden of proving entitlement to an administrative expense is on the claimant and the measure of proof is a preponderance of the evidence. *In re Englewood Community Hospital Corporation,* 117 B.R. 352, 358 (Bankr.N.D.Ill.1990) (citing, *In re Sinclair,* 92 B.R. 787, 788, 20 C.B.C.2d 54 (Bankr.S.D.Ill.1988)).

The courts, which dealt with the question of entitlement to an administrative expense priority status, installed an element of inducement for finding consideration.

A creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984). However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority. *Id.* at 586.

*Employee Transfer Corporation v. Grigsby (In re White Motor Corporation),* 831 F.2d 106, 110, 17 C.B.C.2d 1077, Bankr. L.Rep. ¶ 72026 (6th Cir.1987). *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.), supra,* 851 F.2d at 162.

The *United Trucking Service* Court dealt with a claim for damages incurred to the lessor-creditor from a debtor's post-

petition continued use of leased equipment that allegedly was not in accordance with the terms of a pre-petition lease agreement. The claim was based on the casualty loss value of the uncovered stolen trailer and the repair estimates for the recovered stolen trailer. The Court declared that the key inquiry there was not on inducement, as in *Mammoth, Jartran,* and *White Motor,* and relied on *American Anthracite & Bituminous Coal Corporation v. Leonardo Arrivabene, S.A.,* 280 F.2d 119, 124, 126 (2d Cir.1960) to articulate the appropriate rationale:

> The right to priority in the event the trustee or debtor in possession receives benefits under the [executory] contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable right based upon the reasonable value" of the benefits conferred, rather than upon the contract price.
>
> . . . .
>
> . . . [T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.

*United Trucking Service, supra,* 851 F.2d at 162. "Thus, administrative expenses under § 503 in this case, if allowable, should reflect actual value conferred on the bankrupt estate by reason of wrongful acts or breach of agreement." *United Trucking Service, supra,* 851 F.2d at 162, citing, *In re Dixie Fuels, Inc.,* 52 B.R. 26, 27, 13 B.C.D. 584 (Bankr.N.D.Ala.1985).

The *United Trucking Service* Court held a Court should take into consideration whether the estimated cost of making repairs was economically unjustified. The *Carmichael* Court used a similar view while maintaining that once the claimant has established that the estate actually benefited from the transaction, then the Court can estimate the amount of the benefit by considering the reasonable use of the property. *In re Carmichael, supra,* 109 B.R. at 851.

Just as the Court *In re Armorflite Precision, Inc.,* 48 B.R. 994 (Bankr.Me.1985), looked to Maine contract law [10] to determine the existence of an express or implied contract between the parties giving rise to an inducement, we too turn to the New York law.

New York Jurisprudence informs us:

> [c]ontracts are often said to be implied when their terms are not so stated. Contracts implied in fact are inferred from the facts and circumstances of the case, and are not formally or explicitly stated in words. A contract implied in fact is just as binding as an express contract arising from declared intention, since the law makes no distinction between agreements made by words and those made by conduct. A contract implied in fact is derived from the "presumed" intention of the parties as indicated by their conduct. . . . [T]he only difference between [these two kinds of contracts is] the character of evidence necessary to establish it. . . .
>
> A contract can not be implied in fact where the evidence is inconsistent with its existence. It also may not be implied in fact where it is against the declaration of the party to be charged, against the intention or understanding of the parties, where there is an express contract covering the subject matter involved. . . .

Contracts, 21 NY Jur 2d § 4 (Distinction between express contracts and contracts implied in fact) (citations omitted) (footnotes omitted).

Further:

> There cannot be an express and an implied contract for the same thing existing at the same time. It is only when the parties do not expressly agree that the

---

10. Court turned to the termination of an implied contract under the Maine law, which provides that when "one renders services to another at the request, or with the knowledge and consent of the other, and the surrounding circumstances make it reasonable for him to be-lieve that he will receive payment therefor from the other, and he does so believe, a promise to pay will be inferred and there is an implied contract." *Id.* at 999 (quoting *Morril v. United States,* 228 F.Supp. 734 (D.Me.1964)).

law interposes and raises a promise ... However, this rule is not arbitrary and inflexible.... Under some circumstances the contract may be treated as having been abrogated, and a recovery may be had on an implied promise to pay for benefits conferred thereunder.

Contracts, 21 NY Jur 2d § 5 (Coexistence of express and implied contracts) (citations omitted) (footnotes omitted).

In *In re First Security Mortgage Company, Inc.*, 117 B.R. 1001, 20 B.C.D. 1640 (Bankr.N.D.Okla.1990), the Court dealt with the status and extent of finder's fee to some one who completed his job. The Court inquired into the existence of inducement and concluded:

> ... Dunhill learned of First Security's bankruptcy before completing its contractual engagement to locate a loan closer, inquired of First Security's officer whether the bankruptcy would "make any difference," and was urged to "go ahead," whereupon Dunhill completed its engagement and found a loan closer who was in fact hired by First Security. The "inducement" part of the test is thoroughly satisfied in this case.

*Id.* 117 B.R. at 1004.

As to the "benefit" conferred on the debtor, the Court elaborated

> [a]lthough the loan closer did not finish her job of closing loans, Dunhill did finish its job of finding an acceptable loan closer; and the failure of the loan closer to finish a year's work was neither her fault nor Dunhill's, but was due to First Security's own prior difficulties in management of its affairs. What the Trustee asks the Court to do here is to deny administrative expenses priority to an undoubted post-petition debt deliberately incurred in a legitimate attempt to facilitate reorganization, solely because this particular reorganization effort failed. Creditors asked to contribute their efforts toward reorganization would be forced to gamble on the ultimate success of the reorganization as a whole—even if their particular effort was as successful as it could be, they would be at risk if the reorganization

later collapsed due to someone else's fault. Such a principle would not induce third parties to provide goods and services to debtors attempting reorganization, and would nor serve the basic purpose of 11 U.S.C. § 503(b)(1)(A).

*Id.* at 1005.

The *First Security* Court cautioned that it would not rubber-stamp any post-petition contract, and absent an abnormally high or unrelated fee, or poor or unsatisfactory performance of services, it would not reduce the fee retrospectively.

In the *Jartran* case, the debtor ordered the placement of certain adds in the Yellow Page directories throughout the country. The ads were placed without possibility of revocation, and before the petition was filed. The ads were published after the petition was filed. After the filing, the claimants performed additional services in the regular course of executing the pre-petition contract. The debtor-in-possession did not request the claimants to continue their services, which were significant in value. The Court held that no inducement by the debtor-in-possession existed or was required because the liability for the costs of the ads was irrevocably incurred pre-petition. In addition, the Court appears to hold the mere usage of services does not constitute an acceptance. *Id.* As to acceptance, the *Jartran* Court required a much more active roll on the debtor's part, or as the court described it: "any act of acceptance[.]" *Id.*

The S.D.N.Y. District Court followed the *Jartran* approach in its 1983 *Baths International* decision. The claimant there was a national representative for publishers of classified telephone directories and acted as a middleman between publishers and potential advertisers. The Court held that the effective date of performance was the day no withdrawal could be made—the closing date; thereafter, only ministerial functions were left. Since the closing date occurred pre-petition, the Court concluded the claimant was not entitled to a priority claim. *In re Baths International, supra,* 31 B.R. at 144–45.

In applying the law to the case at bar, we conclude part of DCC's claim is an administrative expense claim and part is not. The Funding Agreements are executory contracts, made pre-petition with the debtor. It is clear the agreements were not terminated pre-petition, and remained viable until their rejection by this Court's Order. It is undisputed the Funding Agreements provide for DCC as an investment finder and executor. The issue in dispute, however, is whether the agreements provide for the management of the investment for Investors, and if not, whether there was any kind of an implied contact which will point to and be an inducement by Investors to DCC to perform the management service and to incur the expenses—the subject matter of its claim.

The Funding Agreements clearly provide that DCC will share with Investors investment banking and other fees earned by it in connection with the activities of the Fund. They also provide that DCC will enter into a management arrangement with each Newco providing for the direction of Newco's operations and for the payment of fees to DCC. The operating expenses of DCC are to be borne by Investors in proportion to its respective commitments to the Fund. The fees to be received by DCC in connection with the acquisitions are to be applied and shared with Investors and, offset the operating cost expense billed to it. Thus, "operating costs" do not relate to any monitoring of shares by DCC on Investors' part, but relate to the process of locating the investment though and including the completion of related activities leading to its execution. The budget was approved by Investors pre-petition. The bill for intended services to be performed post-petition was sent to Investors after the filing under the Funding Agreements.

The declarants of both parties did not testify. Thus, we are left holding their conflicting affidavits. It is undisputed, however, that DCC rendered services to the debtor-in-possession. It is also undisputed that the services in connection with Cherokee benefited the debtor-in-possession overall, even though the public offering was not executed. Because the public offering was postponed due to market conditions, its benefit could be questioned, especially because DCC seems to admit that Investors' "assignments" employed most of it in its regular course of business; thus, proving a motivation to DCC to continue this operation to keep its name and the nature of its activities in the market. Ex. 1 to Bachelor Aff. impliedly supports DCC's allegations that Investors asked and urged it post-petition to hold on and continue the activities that are the subject matter of this motion. Although we find Investors was evasive, it was not under any affirmative duty to tell DCC to stop performing the services. The bankruptcy filing, on one hand, should have made DCC more cautious about Investors's behavior. On the other hand, the very same filing (of a chapter 11 by DBL and Investors) combined with the after filing debtor-in-possession's activities and the relationship with DBL management for ten years creates an entitlement at least to part of the current claim. Thus we find there was an inducement of DCC by the Investors which satisfies the *Jartran* test.

■ The benefit to Investors as to Faire Lanes is disputed by the parties. It is undisputed that DCC caused an increase in Faire Lanes. Investors claims the cost of the investment was written down to zero on Investors' books and that the "proposed" restructuring has little or no value today. The result is that the debtor-in-possession ordered a certain service that in the end conferred almost no benefit to the estate.

Unfortunately, we cannot resolve this dispute because neither party provided us with data in sufficient form to estimate the allowed and disallowed portions of the claim. Accordingly, the parties will be directed to submit pleadings supporting their view of the amount of the claim in accordance with this Memorandum of Decision.