In re **ADELPHIA BUSINESS SOLUTIONS, INC., et al., Debtors.**

In re **Adelphia Communications Corp., et al., Debtors.**

Nos. 02–11389 (REG), 02–41729(REG).

United States Bankruptcy Court, S.D. New York.

Aug. 1, 2003.

Wilmer, Cutler & Pickering, by Philip D. Anker, New York City, for Verizon Communications, Inc.

Weil, Gotshal & Manges, LLP, by Peter A. Antonucci, Judy Liu, New York City, for the Debtors Adelphia Business Solutions, Inc. et al.

Willkie, Farr & Gallagher, by Brian O'Connor, New York City, for Debtors Adelphia Communications Corp., et al.

Kramer, Levin, Naftalis & Frankel, LLP, by Amy Caton, New York City, for the Official Committee of Unsecured Creditors of Adelphia Business Solutions, Inc.

Akin, Gump, Strauss, Hauer & Feld, LLP, by Ira S. Dizengoff, Philip C. Dublin, Shuba Satyaprasad, New York City, for Informal Committee of Secured Noteholders of Adelphia Business Solutions, Inc.

Kasowitz, Benson, Torres & Friedman, LLP, by Daniel Zinman, New York City, for the Official Committee of Unsecured Creditors of Adelphia Communications Corp.

Sidley, Austin, Brown & Wood, LLP, by Jerry L. Bregman, New York City, for the Official Committee of Equity Security Holders of Adelphia Communications Corp.

*INTERIM DECISION ON MOTION OF OPERATING TELEPHONE COMPANY SUBSIDIARIES OF VERIZON COMMUNICATIONS INC. FOR ORDER REQUIRING IMMEDIATE PAYMENT FOR POST–PETITION UTILITY SERVICES*

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the two separately administered, but related, cases under chapter 11 of the Bankruptcy Code of Adelphia Communications Corporation ("ACC") and Adelphia Business Solutions, Inc. ("ABIZ"), subsidiaries of Verizon Communications, Inc. (collectively, "Verizon") move, pursuant to Bankruptcy Code sections 503(a) and (b), for payment, as administrative expenses of each of the ACC and ABIZ estates, for telecommunications services Verizon provided under contracts with ABIZ, but with respect to

which ACC ultimately received the services.[1]

Each of the two estates objects. ABIZ contends that the services were provided for the benefit of ACC; that ABIZ received no benefit from the services; and that the "Post-petition Benefit" requirement for payment of administrative expenses (discussed below) has not been satisfied. ACC contends that the services were provided by Verizon under a contract with *ABIZ*, and that ACC is not in contractual privity with Verizon; that the services were provided by ABIZ and not Verizon, pursuant to a management agreement between ABIZ and ACC; and that the "Transaction with the Debtor–in–Possession" requirement for payment of administrative expenses (also discussed below) has not been satisfied. ACC further contends that before the Court could make a finding to the contrary, it would have to hold an evidentiary hearing.

As a consequence of the two estates' positions, the Court is faced with the Catch–22 situation that if both estate's contentions were to be accepted, Verizon would have supplied millions of dollars of post-petition services for which *no* estate is responsible.[2] The Court finds it hard to believe that it could ever reach such a conclusion, which would result only from an acceptance of ACC's contentions calling for an extraordinarily broad application of the "benefit" requirement (to make ABIZ liable for services it did not use, and did not sell at a profit), and/or an extraordinarily narrow application of the "Transaction with the Debtor–in–Possession" requirement (to relieve ACC of liability for services Verizon continued to provide post-petition, and which ACC continued to accept). And based on the evidence submitted so far, the Court would be hard pressed to find (as ACC contends, but Verizon and ABIZ dispute) that ACC received the services from ABIZ (as a genuine seller of such services) rather than Verizon, or that ABIZ did not simply secure Verizon services for ACC as ACC's agent. Nevertheless, the Court cannot quite so find as a matter of law; while the matter is very close, the Court cannot wholly rule out the existence of material disputed issues of fact in this respect.

For those reasons, and the reasons that follow, Verizon's motion is continued, pending an evidentiary hearing, with respect to ABIZ's role in securing and/or providing the Verizon services from which ACC benefited and seemingly wanted and needed, and any dealings ACC might have had with Verizon that might otherwise be relevant to Verizon's motion.[3] As the Court

---

1. Verizon clarified the nature of its request at oral argument; at this juncture, it seeks only a determination as to liability, and will thereafter work with any estate(s) found liable to try to reach agreement as to the exact amount due. The amount actually to be paid could also be affected by any post-petition setoffs that an estate might have against Verizon. This too is not before the Court for determination at this time.

2. Recognizing that unfairness, ACC argues, relying in part on Fed.R.Evid. 408 matter, that it is willing to make payment to Verizon subject to recovery of such sums from ABIZ, or alternatively to make payment to ABIZ for the services ACC received, but subject to some

substantial rights of setoff with respect to ABIZ–ACC obligations which ACC is likely to assert, and which, if this Court approved such, could cripple ABIZ. While the Court does not necessarily question ACC's good faith in connection with such means to avoid the Catch–22 situation, it regards those means as unfair to ABIZ, and, more importantly, insufficiently responsive to the applicable law, for the reasons described below.

3. At such evidentiary hearing, Verizon, ABIZ and ACC may, if they are so advised, introduce evidence as to direct dealings between ACC and/or Verizon; as to ACC's need for the services and knowing acceptance of the bene-

believes that ACC's position may be only colorable at best, and that Verizon has already suffered substantial delays in securing payment for services undeniably provided, the evidentiary hearing will be held on an expedited basis.

*Background*

On March 27, 2002 (the "ABIZ filing date"), the first of the ABIZ debtors filed cases for relief under chapter 11 of the Bankruptcy Code, and a joint administration order was entered. Subsequently, on June 18, 2002, additional ABIZ subsidiaries also commenced chapter 11 cases, and their cases were added to the ABIZ cases under joint administration.

On June 10, 2002, Century Communications Corp. ("Century"), an ACC subsidiary, filed a petition for relief under chapter 11 of the Code (as a case related to ABIZ, for venue and judge assignment purposes), and on June 25, 2002 (the "ACC filing date"), ACC and a large number of its other subsidiaries filed chapter 11 cases (as cases related to ABIZ and Century, for venue and judge assignment purposes). An order jointly administering the ACC and Century cases (separately from the ABIZ cases) was entered; ABIZ (which now stands alone, after a spin-off from ACC) and ACC shared at least largely similar equity ownership, and the two cases were related for venue and judge assignment purposes, but their differing creditor constituencies and different counsel warranted separate administration. Nevertheless, as this contested matter makes clear, by reason of the two estates' inter-company transactions, actions on behalf of each other, sharing of services, and failures fully to delineate with clarity the debtor(s) involved (particularly in the period pre-dating the spin-off), the two chapter 11 cases are closely related in fact as well

as in law. This Court has had numerous occasions on which it has had to unravel transactions by or for the benefit of one or another, or both, of the estates, or to call upon the two estates to do so.

The services for which Verizon seeks payment—now of an indeterminate amount, but probably of an asserted value (before assertedly applicable setoffs) in the order of magnitude of $20 million—were rendered solely in the postpetition periods for all of the debtors. Verizon is an incumbent local exchange carrier ("ILEC") with whom competitive local exchange carriers ("CLECs"), like ABIZ and (with respect to its telecommunications operations) ACC, connect to provide the services that CLECs provide to their customers. The Verizon services in question here were used by ACC for ACC's CLEC business in 17 CLEC markets that ACC acquired from ABIZ, although it appears that ABIZ and/or ACC failed to notify Verizon of the acquisition, as Verizon contends was required; the contracts continue to show ABIZ as the entity in contractual privity with Verizon. The 17 markets are managed by ABIZ pursuant to management services agreements between ABIZ and ACC.

Without dispute, the Verizon telecommunications services in question are not used in any way by ABIZ. Rather, and without dispute, they are used by ACC for its CLEC business in the 17 markets, and are necessary for its business. It appears that ACC uses the services Verizon has provided; that ACC needs those services; that it wants those services; and that it could not operate its CLEC business in those markets without those services. The Court cannot make a finding on the state of the record at this point that ACC, either pre- or post-petition, ever expressly *asked* Verizon to provide the services (by way of,

fits; and/or anything else that any of them contends is relevant to the motion.

for example, a purchase order or written or oral communication), but (given ACC's silence as to these matters, and the Court's Case Management Order), the Court nevertheless can find that ACC used the services in question; that it wanted them; and that it needed them.

However, while the inference is strong that ACC knowingly accepted the Verizon services, and that the Verizon services that ACC used, to the extent ABIZ acted as a middleman with respect to them, were procured by ABIZ simply as ACC's agent (pursuant to the management services agreements or otherwise), the evidentiary record is thin in this respect; the management agreements are not in the record, and little was presented with respect to the ABIZ–ACC relationship, vis-a-vis Verizon, following the transfer of the 17 markets from ABIZ to ACC. Similarly, the record is thin with respect to the extent, if any, to which ACC may have dealt directly with Verizon with respect to the services Verizon provided for ACC and its customers. These matters (or even any one of them) could, if fleshed out and established in a way adverse to ACC, establish without question ACC's liability for the services Verizon provided for the ultimate benefit of ACC and its telecommunications customers.

The Catch–22 situation with which Verizon is confronted is aggravated by the fact that at the outset of each of the ABIZ[4] and ACC[5] cases, section 366 orders were entered *requiring* Verizon to continue to provide post-petition services for each estate, and providing, *inter alia*, that Verizon would have an administrative expense claim for services it provided.

### Discussion

Understandably frustrated by the failure of either debtor to pay for services Verizon undisputedly provided, Verizon asserts its administrative expense claim, under section 503 of the Code against both estates—reasoning that one or the other must be liable. The determination of that issue turns on application of the caselaw in this Circuit and District, and elsewhere, considering the award of administrative expense treatment with respect to asserted post-petition transactions with or for the benefit of a debtor in a Chapter XI proceeding or chapter 11 case. *See,* in particular, *Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir. 1986) (*"McFarlin's"*); *In re Enron Corp.,* 279 B.R. 79, 85 (Bankr.S.D.N.Y.2002) (Gonzalez, J.) (*"Enron"*); *In re Patient Education Media, Inc.,* 221 B.R. 97 (Bankr.S.D.N.Y.1998) (Bernstein, C.J.) (*"Patient Education Media"*); *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 482, 488 (Bankr.S.D.N.Y.1991) (Conrad, J.) (*"Drexel Burnham"*); *In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir. 1984) (*"Jartran"*); *In re FBI Distribution Corp.,* 330 F.3d 36 (1st Cir.2003) (*"Filene's Basement"*); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) (*"Mammoth Mart"*) (Act Chapter XI case).

### General Principles

Section 503(b) provides for administrative expense treatment for "the actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case." However, a debt is not entitled to administrative expense treatment merely because the right to payment arises after the debtor-in-possession has begun managing the debtor's affairs. *See Jartran,* 732

---

**4.** ABIZ, Case No. 02–11389(REG) (ECF# 297).

**5.** ACC, Case No. 02–41729(REG) (ECF# 154).

F.2d at 587; *McFarlin's*, 789 F.2d at 101. Instead, for an expense to be given administrative expense status, two elements must be satisfied. First, the expense must arise "out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession." *McFarlin's*, 789 F.2d at 101; *see also, e.g., Enron*, 279 B.R. at 85. Second, the expense's consideration must be "both supplied to and beneficial to the debtor in possession in the operation of the business." *McFarlin's*, 789 F.2d at 101; *see also, e.g., Enron*, 279 B.R. at 85. The Court refers to the former requirement as the "Transaction with the Debtor–in–Possession" requirement, and the latter as the "Post-petition Benefit" requirement.

 It is axiomatic that because grants of administrative expense priority cut against the general goal in bankruptcy law to distribute limited debtor assets equally among similarly situated creditors, statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed.[6] It is similarly axiomatic that the party seeking administrative expense status bears the burden of establishing its entitlement to that status. *See, e.g., Drexel Burnham*, 134 B.R. at 489. The requirements for administrative expense treatment, in the context of each of ABIZ and ACC, will be considered in turn.

*Application to ABIZ*

ABIZ does not dispute that its continuing contractual relationship with Verizon during the post-petition period satisfies the "Transaction with the Debtor–in–Possession" requirement. However, its contractual privity is not relevant to the second, "Post-petition Benefit," requirement. ABIZ contends, with considerable force, that the "Post-petition Benefit" require-

ment has not been satisfied. ABIZ points to the undisputed fact that the services Verizon has provided with respect to the 17 markets were not used by ABIZ in any way, and that the Verizon services were used solely by ACC. ABIZ further notes that the services used by ACC were not sold at a markup by ABIZ to ACC.

 In order for the creditor's claim to be considered a "benefit" to the estate for purposes of section 503(b), "[t]here must be a concrete, discernible benefit from actual use because a speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority." *Enron*, 279 B.R. at 86. While it is true that a benefit to the estate does not require physical use by the debtor itself, and it may include subleasing of the property of the debtor (at least where it receives an income stream from the sublease during the reorganization, *id.* at 87), that principle may not change the result here, as ABIZ, without dispute, has not sold Verizon's services to ACC at a markup.

 However, ACC argues, at least impliedly, that the receipt by ABIZ of management fees from ACC under the ABIZ–ACC management agreement could constitute the necessary benefit. The Court has some considerable uncertainty as to whether such a conclusion could be reached here, especially for any liability that would exceed the management fees in amount, and especially since, so far as the record reflects, the Verizon services were neither supplied to, nor beneficial to, ABIZ, and ABIZ had no more than the briefest temporary possession of the services, if even that. *See Enron*, 279 B.R. at 86 ("The mere possession of the claimant's property by the debtor does not warrant administrative claim status."); *Patient Education Media*, 221 B.R. at 102 ("Even

---

**6.** *See, e.g., McFarlin's*, 789 F.2d at 100; *Filene's Basement*, 330 F.3d at 41–42.

where the debtor in possession possesses the nondebtor's property, or has the option to use, no administrative expense liability will attach unless he actually uses it."). But with the management services agreements not yet in the record, and with a less than complete presentation of the facts with respect to the ABIZ–ACC relationship or the routing of Verizon's services, the Court is not quite in a position where it can so find as a matter of law, and is not yet in a position where it can make such a determination as a finding of fact. The motion will be continued, as noted above, for a brief period to permit an evidentiary hearing with respect to these matters.[7]

*Application to ACC*

With respect to ACC, the circumstances are the opposite. ACC does not deny, as it cannot, that the "Post-petition Benefit" requirement has been satisfied; without dispute, the Verizon services were actually used, for the benefit of ACC, to provide essential interconnection services for ACC customers in the 17 markets. Nor does ACC deny that it was aware that Verizon was providing those services, or that they were beneficial. Nor does ACC contend that it did not want the Verizon services. But ACC contends that because the Verizon services were provided under a contract with ABIZ, not ACC, the first of the two requirements has not been satisfied here—the "Transaction with the Debtor–in–Possession" requirement. As a variant of that, ACC argues that a requirement

articulated in some of the cases—that the debtor-in-possession "induced" the post-petition services—is missing here, by reason of the contract with Verizon being with ABIZ and not ACC. And finally, ACC contends that before it can be held liable, there must be an evidentiary hearing.

 While the Court ultimately agrees with ACC that the Court should hold an evidentiary hearing, the Court is of the view that ACC is arguing unduly narrow, and incorrect, standards for the application of the "Transaction with the Debtor–in–Possession" and "induced" requirements. With respect to the former, although ACC argues that "transaction" must mean "contract," and thus contractual privity, the Court disagrees. The cases that articulated the standards for administrative expense treatment—*see McFarlin's, Patient Education Media, Enron, Mammoth Mart, Jartran* and *Filenes's Basement*—consistently used the term "transaction," rather than "contract," covering a broader array of post-petition relations. As importantly or more so, they used the expression "transaction with the debtor-in-possession" in the context of comparing and contrasting that to a transaction with the *pre-petition debtor*.[8] That is significant, as the underlying theory is to encourage vendors to deal with the post-petition estate. The administrative expense priority "furthers the goal of rehabilitation by encouraging third parties to supply goods and services on credit to the estate," *Patient Education Media,* 221

---

7. If the evidence on a fuller record were to confirm, as ABIZ argues, that ABIZ had redirected Verizon services for the use of ACC, but without a markup, ABIZ would not be receiving a benefit. Acting as a conduit without profit is akin to mere possession, which is not eligible for administrative status. *See Patient Education Media,* 221 B.R. at 102.

8. *See, e.g., Filene's Basement,* 330 F.3d at 42:

In general, for a claim to qualify as an administrative expense under section 503(b)(1), (1) it must have arisen from a transaction with the trustee or debtor-in-possession, rather than from a prepetition transaction with the debtor....

The emphasis is on when, and with whom, the transaction took place, as compared and contrasted to the nature of the "transaction."

B.R. at 101—*i.e.*, by providing fair treatment to those who provide goods or services, on a post-petition basis, to debtors-in-possession. Achieving those goals requires satisfying the legitimate expectations of those who supply post-petition goods and services.[9] For those reasons, it is the circumstances surrounding the post-petition delivery and receipt of the goods and services, rather than either the presence or absence of a contract for their delivery, or contractual privity, that is determinative.[10]

In support of its position, ACC cites two cases in particular: *In re Larsen*, 80 B.R. 784 (Bankr.E.D.Va.1987), and *In re Armorflite Precision, Inc.*, 43 B.R. 14 (Bankr.D.Me.1984), *aff'd*, 48 B.R. 994 (D.Me.1985). Neither causes this Court to come to a different view.

*Larsen* has little factual similarity to this case. There the administrative expense claimant, who was entitled to payment on two notes that had been executed pre-petition, sought to recover on those notes by reason of post-petition events that had revived those obligations. The court understandably rejected that request, finding that the administrative expense claimant had extended its credit *before* the debtor had filed, and hence the "Transaction with the Debtor–in–Possession" requirement was not satisfied.

While *Armorflite*—in which, with some limited exceptions, the court declined administrative expense treatment for the use of two lathes that had been leased, pre-petition, by an equipment lessor to the debtor's affiliate—has a greater similarity to the facts here (as in both cases a creditor initially dealt with one debtor and the benefit wound up in the hands of another), it is missing a critical element that is present here: continuing steps by the administrative expense claimant to provide further services on a post-petition basis. The lathes had been provided pre-petition, and the court denied administrative expense priority for periods of post-petition usage in which the lessor was a passive bystander with respect to that activity. Neither of those factors is present here.

To be sure, there is language in some of the cases, *see, e.g., Jartran*, 732 F.2d at 587; *Enron*, 279 B.R. at 85; *In re CIS Corp.*, 142 B.R. 640, 643 (S.D.N.Y.1992) (Keenan, J.), as a variant of the "Transaction with the Debtor–in–Possession" prong, requiring, for the award of administrative expense treatment, the debtor-in-possession to have "induced" the post-petition transaction. But "inducement" as there used must be viewed in the context in which it was used, and the purpose of that requirement:

> [T]he reason that *inducement* of the creditor's performance by the debtor-in-

---

**9.** That is true even though the Court fully recognizes that once the threshold entitlement is established, the measure of compensation is the reasonable value of the services, guided by "the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him." *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 126 (2d Cir.1960); *Patient Education Media*, 221 B.R. at 104. Thus the legitimate expectation would be for reasonable compensation, even if not, necessarily, at the exact contract rate. There frequently will not be a difference; "[t]he contract rate is

presumed to set the reasonable value, but either party may offer evidence to prove a different reasonable value." *Id.* (*citing In re Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir.1988)).

**10.** *See also In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 533 (3d Cir.1999) (considering claim of disappointed bidder for break-up fee under a section 503(b) analysis, and stating, in that connection, "[w]e assume that bidding at the sale of O'Brien's assets constitutes a transaction with the debtor-in-possession for purposes of § 503(b)(1)(A).").

possession is crucial to a claim for administrative priority is rooted in the policies that gave rise to the creation of the priority. Thus administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization.... [T]his approach simply carries out the teaching of the Supreme Court, "that fairness requires that any claims incident to the debtor-in-possession's operation of the business be paid before those for whose benefit the continued operation of the business was allowed."

*Jartran*, 732 F.2d at 588 (emphasis in original) (citing *Mammoth Mart* and *Reading Co. v. Brown*, 391 U.S. 471, 478, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), which granted administrative expense priority for tort claims based upon negligence attributable to a debtor-in possession).[11]

■ *Jartran* imposed the "inducement" requirement to deal with a situation in which the purveyor of the directory services had provided a post-petition benefit, but where the services had been ordered pre-petition, and the post-petition debtor-in-possession had not sought the services, and did not accept them. The "inducement" requirement is very much a requirement in the law, but it must be construed in accordance with common sense—to filter out, as in *Jartran*, claims for administrative expense treatment where the post-petition benefit is requested pre-petition and/or unwanted by the post-petition debtor-in-possession, but to require administrative expense treatment where the post-petition benefit is knowingly accepted and desired, post-petition, by the post-petition debtor-in-possession.[12]

■ The application of those principles leads the Court to conclude that the Court cannot quite grant Verizon administrative expense treatment against ACC as a matter of law. Based on the papers submitted so far, the inference is at least strong that, post-petition, ACC knowingly accepted Verizon services, and wanted them—indeed, that it could not have served the 17 markets, post-petition, without them—which, if shown, would satisfy the caselaw requirements, including those of *Jartran*.[13] Similarly, on the record so far, it seems that this case is exactly the opposite of *Jartran*, where the services were sought

---

**11.** *See also Enron:*

> Considering inducement by the debtor-in-possession to be a crucial element comports with the policy reason for allowing the priority, which is to encourage third-parties to supply the debtor-in-possession with goods and services with the goal of achieving a reorganization to benefit all creditors.

279 B.R. at 86 (citing *Jartran* ).

**12.** The thrust of *Jartran's* "inducement" requirement, in filtering out transactions initiated by the pre-petition debtor, on the one hand, as compared to the post-petition debtor-in-possession, on the other, is apparent in the decision in *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir.1987). The Sixth Circuit there stated:

> A creditor provides consideration to the bankrupt estate only when the *debtor-in-possession* induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a *pre-petition debtor*, then consideration was given to that entity rather than to the debtor-in-possession. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). However, if the inducement came from the *debtor-in-possession*, then the claims of the creditor are given priority. *Id.* at 586.

831 F.2d at 110 (emphasis added).

**13.** *See Jartran*, 732 F.2d at 588 ("We are unable, however, to find *any act of acceptance* (or inducement) that would satisfy the *Mammoth Mart* test and we agree with the First Circuit, that *absent such an act*, the language and policies of 503 would not be served by priority here") (emphasis added).

only pre-petition—especially since it was stated in ABIZ papers that ACC had paid Verizon directly for services it received through a date in September 2002, and stated in oral argument that ACC personnel may have dealt directly with Verizon people in the field.[14] However, the Court does not believe that it should be drawing inferences like these as a matter of law, especially when potentially significant facts were put forward to the Court only in passing.

As in *Patient Education Media*—where Judge Bernstein first conducted an evidentiary hearing before making findings as to the debtor-in-possession's "knowingly and willingly" having used the administrative expense claimant's property, *see* 221 B.R. at 102 [15]—the Court believes that findings of that character should be made only after an evidentiary hearing.[16] Points that, under the management services agreements (which are not now in the record), ABIZ procured Verizon services only as ACC's agent are likewise suitable for determination only after an evidentiary hearing. At the ensuing evidentiary hearing, the Court will apply the principles described above to the presumably more

extensive factual record that each side will be free to develop.

### Conclusion

For the foregoing reasons, this matter will be continued pending the completion of an evidentiary hearing. Further proceedings will be in accordance with the legal principles set forth in this decision.

---

**14.** In *Drexel Burnham*, Judge Conrad considered *Jartran's* inducement requirement in ultimately allowing, in part, an administrative expense claim. He noted, properly, that the Seventh Circuit in *Jartran* had denied administrative expense treatment because "no inducement by the debtor-in-possession existed or was required because the liability for the costs of the ads was irrevocably incurred prepetition." *Drexel Burnham*, 134 B.R. at 491. Significantly, he continued that the *Jartran* court required the post-petition debtor-in-possession to have engaged in "any act of acceptance." *Id.* (quoting *Jartran*, 732 F.2d at 588). This Court notes, in that connection (and further supporting Judge Conrad's analysis), that, significantly, the full expression utilized by the *Jartran* court was "any act of acceptance or inducement," *id.*—indicating that either would suffice, and that a post-petition act of acceptance would be a satisfac-

tory substitute for a post-petition act of inducement.

**15.** "The evidence at trial amply supports a finding that [the debtor] PEMI knowingly and willingly used [administrative expense claimant] Sonalyst's property during the prerejection period to preserve and maximize the assets of the estate." *Id. See also id.* at 99 ("The matter was tried before me on April 7, 1998. Three witnesses testified, and numerous documents were received in evidence.").

**16.** Judge Bernstein also found it of significance in *Patient Education Media* that the debtor there "did nothing to discourage Sonalyst's performance...." *Id.* at 103. The Court believes that it would be helpful to know whether or not this fact, as to which the record now is silent, is present here as well.